IN THE
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | | |
|---|---|---|
| A. CLAY COX, not individually but as a trustee for the estate of Central Illinois Energy Cooperative,<br><br>      Plaintiff,<br><br>      v.<br><br>MICHAEL E. EVANS, NANCY A. SCHELL, and FROEHLING, WEBER, EVANS & SCHELL, LLP,<br><br>      Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 18-1105 |

## ORDER AND OPINION

This matter is now before the Court on a Motion for Partial Summary Judgment (Doc. 6) filed by Plaintiff, A. Clay Cox, as Trustee for the estate of Central Illinois Energy Cooperative, and a Motion for Summary Judgment (Doc. 10) filed by Defendants, Michael E. Evans, Nancy A. Schell, and Froehling, Weber, Evans & Schell, LLP. For the reasons stated below, both motions are DENIED.

### BACKGROUND

*Formation of Central Illinois Energy Cooperative*

In October 2001, a group of farmers organized Central Illinois Energy Cooperative ("the Coop") to construct and operate an ethanol facility in Canton, Illinois. The facility would consist of an ethanol plant and a grain handling facility component, which would provide grain to the ethanol plant for the production of ethanol and other byproducts.

1

Michael E. Evans ("Evans"), an attorney and a member of Froehling, Weber, Evans & Schell, LLP ("the Firm"), prepared the Coop's Articles of Incorporation and signed them as an incorporator. Evans and his wife, Suzanne Ginger ("Ginger"), were shareholders of the Coop, and until early 2008, Evans served as the Coop's attorney and registered agent.

*Funding for Construction*

To gather investors for the ethanol facility, Evans, at the direction of the Coop's board, created two Delaware limited liability companies, Central Illinois Energy, LLC ("Opco") and Central Illinois Holding Company, LLC ("Holdco"). Holdco consisted of Opco, HWS, Cargill, Fuel For Farmers, LLC, and Whitebox CIE Pledgors, Inc. ("Whitbox"). Mike Smith ("Smith") was the general manager for both Opco and the Coop and a member of the Coop's board.

In March 2005, the Coop contracted with Nostaw, a general contractor, to construct the grain handling facility for $5.4 million. To finance construction, the Coop borrowed $2 million from Whitebox, as evidenced by a note requiring payment in full on May 17, 2007.

The construction project began experiencing financial difficulties when the Coop was unable to pay invoices from Nostaw and the final installment of the Whitebox loan in May 2007. As a result, Nostaw threatened to file a lien and stop construction. The Coop needed to secure additional financing through other investors to continue construction.

*Green Lion Bio-Fuels, L.L.C.*

Green Lion Bio-Fuels, L.L.C. ("Green Lion"), a company that Evans' wife formed in June 2006, was a potential source of financing. Ginger filed Articles of Formation for Green Lion with the Delaware Secretary of State, and on August 25, 2006, Evans filed an Application for Admission to Transact Business in Illinois on its behalf. (Bankruptcy Case No. 11-08023[1], Doc. 161, ¶45).

---

[1] Bankruptcy Case No. 11-08023 refers to the adversary proceeding *Cox v. Evans* in the U.S. Bankruptcy Court for the Central District of Illinois.

In early 2007, Ginger attended Coop board meetings and advised the board members that Green Lion wanted to develop ethanol projects in the area and was interested in financing construction of the ethanol facility. The board members were told that "Green Lion was a small group of investors with money in a bank in Minneapolis…" and that the company was interested in providing $140 million to fund the ethanol plant and grain handling facility. (Doc. 6-1, pp. 6-7).

*Waiver of Conflict of Interest*

In April 2007, Evans and his law partner, Nancy Schell ("Schell"), met with the Coop's board and advised the members that Opco and Green Lion were engaged in confidential business discussions related to Green Lion providing financing for Opco. Evans also advised the board that the Firm provided legal representation to the Coop, Opco, Holdco, Fuel From Farmers, LLC (a minority member of Holdco also managed by Ginger), and Green Lion.

Evans informed the board that members of the Firm's staff and/or their family members had equity interests in the Coop, Fuel From Farmers, LLC, and Green Lion, but he did not disclose the exact percentages of their interests. (Doc. 6-1, p. 8, ¶ 31; Doc. 17, p. 2, ¶ 31). At the time, the membership interests in Green Lion were held by Ginger (Evans' wife) (95.93419%), Amber Smudge Corp. (1.18652%), Fuel From Farmers, LLC (1.09951%), and Ken Pflederer (1.77978%).

Evans presented the board with a Waiver of Conflict of Interest, and the board members voted to authorize its chairman to execute the Waiver. Although Ginger held 95.93419% of the membership interests in Green Lion, the Waiver stated Ginger held a "minority" interest. ("Suzanne Ginger is one of the founders of Green Lion Bio-Fuels, and holds a minority equity financial interest therein."). (Doc. 6-6, p. 4).

*Green Lion Purchases the Grain Handling Facility*

On May 10, 2007, seven days before the Whitebox loan payment was due, Green Lion offered to lend the Coop $5 million to complete construction. Green Lion's chief operating/financial officer, Richard Kemple, informed Smith that Green Lion would have to purchase the grain handling facility to obtain a conventional construction loan.

The Coop and Green Lion agreed that the Coop would continue to manage the construction and Green Lion would provide the financing and take ownership of the grain handling facility pursuant to a Purchase Agreement. (Docs. 8-18, 8-19). Under a Buy Back Agreement, the Coop would have the right to repurchase the grain handling facility upon the occurrence of certain events. (Docs. 8-20, 8-21). Evans drafted the agreements and sent them to Schell, Kemple, and Smith to review.

At the end of May 2007, Evans met with Kenneth Eathington, an attorney at Husch Blackwell, to discuss Eathington's participation in the transaction on behalf of the Coop. Eathington was asked to review and comment on the Purchase and Buy Back Agreements Evans drafted.

On June 4, 2007, Evans and Schell met with the Coop board, and the board adopted a resolution authorizing the Coop to sell the grain handling facility to Green Lion for $7.75 million pursuant to the terms of the Purchase Agreement. Eathington did not attend the meeting.

On June 5, 2007, a day after the board authorized the sale of the facility, Eathington provided Schell with comments on the draft Purchase and Buy Back Agreements. Between June 5 and June 12, 2007, Schell circulated various revisions to the Agreements. (Bankruptcy Case No. 11-08023, Doc. 161, ¶¶105-106, 112, 116 and 122).

On June 12, 2007, the Coop sold almost all of its assets, including the unfinished grain handling facility to Green Lion for $7.75 million, subject to a repurchase obligation. Green Lion agreed to assume the Coop's liability to Nostaw ($976,295.67 and $258,777.83) and another contractor ($251,722.29) to offset the purchase price. Under the Purchase Agreement, the Coop remained responsible for the construction and completion of the grain handling facility, while Green Lion, through its lender, Ridgestone Bank, was responsible for construction pay requests.

On December 13, 2007, the Coop ceased work on the ethanol plant and grain handling facility and filed for Chapter 11 bankruptcy. On May 1, 2009, an involuntary Chapter 11 petition was filed against the Coop. On July 16, 2009, the bankruptcy case was converted to a liquidation proceeding under Chapter 7 of the United States Bankruptcy Code, and Richard Barber was appointed Trustee. On February 2, 2012, Plaintiff, A. Clay Cox ("Cox"), was appointed successor Trustee for the Coop.

## PROCEDURAL HISTORY

On April 4, 2011, Cox brought an adversary proceeding against Evans, Schell, and the Firm ("Defendants"). In Counts I, II, and III of Plaintiff's First Amended Complaint (Doc. 8-2), Cox alleges Defendants committed legal malpractice by failing to (i) obtain the full purchase price of the grain handling facility; (ii) advise the Coop not to pay certain closing costs for Green Lion; and (iii) advise the Coop not to accept membership shares in Green Lion as part of the consideration for the transaction. In Count IV, Cox alleges Evans engaged in self-dealing and breached his fiduciary duty to the Coop as a result of the Coop's conveyance of its grain handling facility to Green Lion. (Doc. 8-2, pp. 33-40). Count IV is pleaded in the alternative to Counts I, II, and III. (Doc. 8-2, p. 33).

Originally, the case was assigned to United States Bankruptcy Court Judge Thomas J. Perkins, who continues to administer the bankruptcy case. On March 13, 2018, Plaintiff filed a Motion to Withdraw Reference. (Doc. 1). On March 28, 2018, the District Court granted Plaintiff's Motion and the referral to the Bankruptcy Court was withdrawn pursuant to 28 U.S.C. § 157(d).

On June 8, 2018, Plaintiff filed a Motion for Partial Summary Judgment seeking summary judgment only on Count IV. (Doc. 6). On June 12, 2018, Defendants filed a Motion for Summary Judgment seeking judgment in their favor on all counts of Plaintiff's First Amended Complaint. (Doc. 10). This Opinion follows.

## STANDARD OF REVIEW

A motion for summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that might affect the outcome of the suit. *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598-99 (7th Cir. 2000) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The moving party may meet its burden of showing an absence of material fact by demonstrating "that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

If the moving party meets its burden, the non-moving party then has the burden of presenting specific facts to show there is a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Federal Rule of Civil Procedure 56(e) requires the non-moving party to go beyond the pleadings and produce evidence of a genuine issue for trial. *Celotex*, 477 U.S. at 324.

When considering a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at

255. The court must determine if "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may be resolved in favor of either party." *Id.* at 250. If such factual issues exist, then the case must proceed to trial. *Id.*

## ANALYSIS

The issues in the case at hand are (1) whether Defendants committed legal malpractice, and (2) whether Evans breached his fiduciary duty to the Coop.

In their Motion for Summary Judgment (Doc. 10), Defendants argue the Coop received bargained-for consideration for the grain handling facility and that it was fully aware of the risks connected to the transaction. Additionally, Defendants assert they did not proximately cause the damages the Coop allegedly suffered as a result of the transaction. (Docs. 10-11).

In his Motion for Partial Summary Judgment (Doc. 6), Cox argues Evans breached his fiduciary duty to the Coop and cannot overcome the presumption of undue influence because (1) Evans did not disclose all relevant information about Green Lion to the Coop; (2) Green Lion did not provide adequate consideration to the Coop when purchasing the grain handling facility; and (3) the Coop did not have the necessary independent legal advice before purchasing the facility. (Doc. 6-14, pp. 23-28). In response, Evans argues that a genuine issue of material fact exists as to whether he breached a fiduciary duty. Additionally, Evans argues that even if he breached his fiduciary duty, the breach was not the proximate cause of the Coop's alleged damages.

The Court will address both Motions for Summary Judgment together below as each count relies on the same operative facts.

*Legal Malpractice*

In an action for legal malpractice under Illinois law, the plaintiff must first establish an attorney-client relationship existed between the parties. *Cleveland v. Rotman*, 297 F.3d 569, 572

(7th Cir. 2002). Plaintiff must also show (1) the defendant attorney owed the plaintiff a duty of care arising from the attorney-client relationship; (2) the defendant breached that duty; and (3) as a proximate result, the plaintiff suffered damages. *Tri-G, Inc. v. Burke, Bosselman & Weaver*, 222 Ill.2d 218, 225-26 (2006).

*Attorney-Client Relationship*

The parties dispute whether an attorney-client relationship existed between the Coop and the Defendants. (Doc. 8-2, p. 23, ¶132; Bankruptcy Case No. 11-08023, Doc. 161, p. 34, ¶132). Defendants assert that Mike Smith, a board member and the Coop's general manager, retained attorney Kenneth Eathington as separate counsel for the Coop. (Doc. 11, p. 7, ¶48). However, Cox asserts it was Evans, not Smith, who met with Eathington to discuss Eathington's participation in the transaction. (Doc. 24, pp. 7-8, ¶48; Doc. 6-8, at 43:22 – 45:10). Cox also asserts that Eathington was additional (not separate) counsel and that it was understood Evans and Schell would perform all legal services necessary to negotiate and document the transaction. (Doc. 24, p. 8, ¶48). Cox states the purpose of Eathington's involvement was simply to review and comment on the documents Evans and Schell drafted. *Id.* Cox argues Eathington did not offer his comments on the draft Purchase Agreement until *after* the Coop's board voted to approve the sale of the facility to Green Lion. *Id.*; (Bankruptcy Case No. 11-08023, Doc. 161, ¶103).

Defendants claim Smith did not rely on legal advice from Evans and Schell (Doc. 11, p. 7, ¶49), but Cox argues Smith testified that if he had questions concerning the validity or enforceability of the transactional documents that he would have asked someone at the Firm for clarification. (Doc. 24, p. 8, ¶49; Doc. 11-1 at 173:19-174:5). Coop board member Tim Wagenbach testified that when the board voted to approve the Purchase Agreement on June 4, 2007, the board members relied on the advice of Smith and the Coop's attorneys. (Doc. 24, pp. 8-9, ¶49; Doc. 11-

8

2 at 28:3-9). The only attorneys present at the June 4, 2007, board meeting were Evans and Schell. (Doc. 24, p. 9, ¶49).

In his motion, Cox argues an attorney-client relationship existed between Evans and the Coop when Evans "maneuvered the transfer of the Grain Facility from CIEC to Green Lion…" (Doc. 6-14, pp. 22-23). Both parties agree that "[f]rom its inception until sometime in early 2008 Evans was the Coop's attorney and registered agent" and that the transaction occurred in June 2007. (Doc. 6-1, pp. 3, 16, ¶¶ 6, 70; Doc. 17, pp. 2, 6, ¶ 70).

The Court finds the undisputed material facts show an attorney-client relationship existed between Evans and the Coop. He assisted and advised the Coop in connection with the purchase of the grain handling facility; he drafted the Purchase and Buy Back Agreements; and he was present at the board meeting on June 4, 2007. Moreover, both parties agree he was the Coop's attorney when the closing occurred in June 2007. As the Coop's attorney, Evans owed his client a fiduciary duty "to exercise the utmost good faith and fairness" when dealing with the Coop. See *Coughlin v. SeRine*, 154 Ill. App. 3d 510, 515 (1st Dist. 1987) (citing *Drake v. Becker*, 14 Ill. App. 3d 690, 694 (1st Dist. 1973)).

Additionally, after considering the evidence and drawing all justifiable inferences in favor of the non-movant, the Court finds that Schell also had an attorney-client relationship with the Coop. The undisputed material facts show that Schell played an integral role in drafting the Purchase and Buy Back Agreements and was present at the June 4, 2007, board meeting when the board voted to approve the Purchase Agreement and move forward with the transaction. As members of Froehling, Weber, Evans & Schell, LLP, the Court also finds an attorney-client relationship existed between the Coop and the Firm.

*Breach of Fiduciary Duty*

To prevail on a breach of fiduciary duty claim under Illinois law, the plaintiff must prove that (1) a fiduciary duty existed; (2) the defendant breached its fiduciary duty; and (3) the breach proximately caused the plaintiff's injury. *Neade v. Portes,* 193 Ill.2d 433, 444 (2000).

A fiduciary relationship exists between a client and his or her attorney as a matter of law. *Pippen v. Pedersen & Houpt*, 2013 IL App (1st) 111371, ¶ 22 (citing *Owens v. McDermott, Will & Emery,* 316 Ill. App. 3d 340, 351 (1st Dist. 2000)). "The fiduciary duty owed by an attorney to a client encompasses the obligations of fidelity, honesty, and good faith." *Pippen*, 2013 IL App (1st) 111371, ¶22 (quoting *Metrick v. Chatz,* 266 Ill. App. 3d 649, 656 (1st Dist. 1994)).

Rule 1.8 of the Illinois Rules of Professional Conduct provides, in relevant part:

(a) A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless:

   (1) the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing in a manner that can be reasonably understood by the client;

   (2) the client is informed in writing that the client may seek the advice of independent legal counsel on the transaction, and is given a reasonable opportunity to do so; and

   (3) The client gives informed consent, in a writing signed by the client, to the essential terms of the transaction and the lawyer's role in the transaction, including whether the lawyer is representing the client in the transaction.

ILLINOIS RULES OF PROF'L CONDUCT OF 2010 R. 1.8(a)(1)-(3) (2010).

All transactions between an attorney and a client "are subject to the closest scrutiny." *Johnson v. Gudmundsson*, 35 F.3d 1104, 1115 (7th Cir. 1994) (quoting *In re Marriage of Pagano*, 154 Ill.2d 174, 179 (1992)). When an attorney engages in a transaction with a client and benefits as a result, "the burden rests on the attorney to show that it is fair, equitable and just, and that it

did not proceed from undue influence." *In re Imming*, 131 Ill.2d 239, 256 (1989). See also *Tower Investors, LLC v. 111 East Chestnut Consultants, Inc.*, 371 Ill. App. 3d 1019, 1035 (1st Dist. 2007).

To prove the benefit the attorney received did not result from undue influence, the attorney must prove "(1) that he made a full and frank disclosure of all the relevant information that he had; (2) that the consideration was adequate; and (3) that the principal had independent advice before completing the transaction." *In re Imming*, 131 Ill.2d 239, 256 (1989).

### *(1) Full and Frank Disclosure*

The parties agree Evans informed the Coop that members of his Firm's staff and/or their family members had equity interests in the Coop, Fuel From Farmers, LLC, and Green Lion. (Doc. 6-1, p. 8, ¶ 30; Doc. 17, p. 2, ¶ 30). However, the parties dispute whether the extent of those equity interests was disclosed and if Evans provided adequate information to the Coop about Green Lion's financial condition. (Doc. 18, p. 15).

Cox argues Evans allowed the Coop and Eathington to believe Green Lion had more than fifty members and liquid assets in excess of $5.5 million when in reality, Green Lion never had more than six members and Ginger's individual membership interest never dipped below 54%. (Doc. 6-14, pp. 23-24). Moreover, Amber Smudge, a company Ginger controlled and Evans served as secretary/treasurer and member of the board, owned a 33.96417% interest in Green Lion. *Id.*

Additionally, Cox asserts Evans never disclosed the fact that he, Ginger, and Kemple were guarantying the Green Lion Loan. (Doc. 6-1, p. 17, ¶¶ 73-74). Evans disputes this material fact and claims he disclosed this information. (Doc. 17, p. 4, ¶¶ 73-74). Cox argues Evans knew Green Lion's liquid assets totaled less than $100,000 at the time of the transaction and that the majority of Green Lion's purported capital was attributable to Ginger's contribution of intellectual property

valued at $2,160,000. (Doc. 6-14, p. 24). According to Cox, Evans failed to disclose any of this information to the Coop. *Id.*

Although the Coop's board agreed to sign the Waiver of Conflict of Interest, the document indicated Ginger held a "minority" interest in Green Lion. Yet, when the Waiver was signed, she held 95.93419% of the membership interests.

The Court finds that there is a genuine dispute of material fact regarding whether Defendants made a full and frank disclosure of all relevant information to the Coop. This is a factual issue only the finder of fact can resolve.

### *(2) Adequate Consideration*

The parties also dispute whether Green Lion gave the Coop adequate consideration to purchase the grain handling facility. The parties do not even agree what the purchase price of the facility was. Cox argues that according to the Purchase Agreement, the Coop agreed to sell the facility to Green Lion for $7.75 million. (Doc. 6-1, p. 16, ¶ 68). Evans denies the purchase price was $7.75 million and claims it was $3,739,499.98 cash, in addition to Green Lion assuming some of the Coop's financial obligations. (Doc. 17, p. 4, ¶ 68).

The parties also disagree about the appraised value of the grain handling facility. To establish that consideration was "adequate," Evans argues that Federal Appraisal & Consulting appraised the grain handling facility, if completed, at $6,978,128 as of June 12, 2007. (Doc. 17, p. 13, ¶ 7). Cox disputes this assertion and argues the appraisal was based on the facility "as is" and not on the value of the facility if completed. (Doc. 18, p. 11, ¶ 7).

The Court finds there is a genuine dispute of material fact as to not only what the consideration was, but also whether it was adequate.

### *(3) Independent Advice*

The parties also dispute whether the Coop had independent legal advice. Evans argues the Coop engaged Eathington, an independent attorney, to represent the Coop. Cox argues Eathington was additional (not separate) counsel because Evans and the Firm ultimately maintained control of the transaction. (Doc. 6-14, p. 26). Additionally, Cox argues Eathington understood Evans and Schell would perform all legal services necessary to negotiate and document the transaction. (Doc. 6-1, p. 12, ¶ 48). Cox asserts the purpose of Eathington's engagement was to review and comment on those documents and prepare the deed and real estate transfer declaration. (Doc. 24, p. 8).

Evans and Schell were present at a Coop board meeting where the board voted to authorize the Coop to enter into a refinancing arrangement with Green Lion. However, Eathington had not yet reviewed the Purchase Agreement, nor was he present at the board meeting. (Doc. 6-14, p. 27). In fact, the record demonstrates Eathington did not comment on the Purchase Agreement until June 5, 2007, the day *after* the board adopted a resolution authorizing the sale of the grain handling facility to Green Lion. (Doc. 24, p. 8). In addition, Eathington was not present at the closing. (Doc. 6-9, p. 5).

Evans argues that Eathington actively participated in representing the Coop, commented on the Purchase and Buy Back Agreements, and prepared the deed and tax form. (Doc. 17, p. 18). Evans claims that from April 23, 2007, through closing, Smith did not rely on Evans or his Firm to provide legal advice with respect to the transaction. (Doc. 18, p. 3, ¶ 49).

However, the evidence demonstrates that Evans prepared and circulated the initial drafts of the Purchase and Buy Back Agreements, authored and circulated legal opinions on behalf of the Coop and Green Lion, and negotiated the Nostaw Payment Agreement and Green Lion Loan. (Doc.

13

24, pp. 50-51). Furthermore, Schell edited the Agreements, drafted an escrow agreement, prepared and executed a Green Lion membership resolution, and participated in the closing. *Id.*

Mike Smith testified that if he had questions concerning the validity or enforceability of the transactional documents, he would have asked someone at Evans' firm to clarify. (Doc. 6-14, p. 28; Doc. 11-1, at 173:19 – 174:5). After the transaction was complete, Eathington sent his $4,285.88 invoice directly to Evans, not the Coop, for payment. (Doc. 6-14, p. 28). While it is undisputed that Eathington represented the Coop in some capacity, the extent of his representation and whether it was independent, are factual issues only the finder of fact can resolve. As such, the Court finds that a genuine issue of material fact exists as to whether Defendants – acting as the Coop's counsel – breached the fiduciary duty they owed to their client.

*Proximate Cause*

In order to survive a motion for summary judgment, Cox must show the Coop suffered actual damages as a result of Defendants' alleged legal malpractice. Actual damages are essential to a viable cause of action for legal malpractice. *Tri-G, Inc. v. Burke, Bosselman & Weaver*, 222 Ill.2d 218, 226 (2006). Under Illinois law, "[t]he proper measure of damages in a legal malpractice case puts a plaintiff in a position he would have been had the attorney not been negligent." *Meriturn Partners, LLC v. Banner and Witcoff, Ltd.*, 2015 IL App (1st) 131883, ¶ 18 (citing *Gaylor v. Campion, Curran, Rausch, Gummerson and Dunlop, P.C.*, 2012 IL App (2d) 110718, ¶ 61). "The existence and amount of damages in a legal malpractice case is a question for the jury and great weight must be given to the jury's determination." *Meriturn Partners, LLC*, 2015 IL App (1st) 131883, ¶ 18 (citing *Union Planters Bank, N.A. v. Thompson Coburn LLP*, 402 Ill. App. 3d 317, 356 (2010)).

"The issue of proximate causation in a legal malpractice setting is generally considered a factual issue to be decided by the trier of fact." *Governmental Interinsurance Exchange v. Judge*, 221 Ill.2d 195, 210 (2006) (quoting *Renshaw v. Black*, 299 Ill. App. 3d 412, 417-18 (1998)). Such a determination is to be made by the trier of fact after consideration of all the evidence and attending circumstances. *Judge,* 221 Ill.2d at 210. The issue of proximate causation should never be decided as a matter of law where reasonable persons could reach different results. *Nettleton v. Stogsdill*, 387 Ill. App. 3d 743, 753 (2008). See also *Public Taxi Service, Inc. v. Barrett*, 44 Ill. App. 3d 452, 456 (1st Dist. 1976) (proximate cause should be determined as a matter of law only where (1) the facts are undisputed and (2) there can be no difference in the judgment of reasonable persons as to the inferences that may be drawn from the facts). Accordingly, even if the Court were to assume Evans breached his fiduciary duty, the Court would be unable to grant summary judgment on Counts I, II, III, and IV of Plaintiff's First Amended Complaint because genuine issues of material fact exist as to whether Defendants proximately caused the alleged damages.

## CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment on Counts I, II, III, and IV (Doc. 10), and Plaintiff's Motion for Partial Summary Judgment on Count IV (Doc. 6) are DENIED.

Entered this 20th day of December, 2018.

s/ James E. Shadid
James E. Shadid
Chief United States District Judge
