E-FILED
Friday, 01 May, 2020  01:20:20 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| A. CLAY COX, not individually but as Trustee for the estate of Central Illinois Energy Cooperative,<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL E. EVANS, NANCY A. SCHELL, and FROEHLING, WEBER, EVANS & SCHELL, LLP,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Case No. 18-cv-1105-JES-JEH<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## ORDER AND OPINION

This matter is now before the Court on Plaintiff's Motion (Doc. 56) to Bar the Testimony of Defendants' Expert Walker R. Filbert and Memorandum (Doc. 57) in Support, to which Defendants have filed a Response (Doc. 60). For the reasons set forth below, Plaintiff's Motion (Doc. 56) is GRANTED in part and DENIED in part.

### FACTUAL BACKGROUND

The facts of this case are largely recounted in the Court's Order (Doc. 30) on the parties' Motions for Summary Judgment, which the Court reproduces here together with the additional facts recited in Plaintiff's Motion (Doc. 56) to Bar the Testimony of Defendants' Expert Walker R. Filbert, Memorandum (Doc. 57) in Support, and Defendants' Response (Doc. 60).

### *Formation of Central Illinois Energy Cooperative*

In October 2001, a group of farmers organized Central Illinois Energy Cooperative ("the Coop") to construct and operate an ethanol facility in Canton, Illinois. The facility would consist of an ethanol plant and a grain handling facility component, which would provide grain to the ethanol plant for the production of ethanol and other byproducts.

1

Michael E. Evans ("Evans"), an attorney and a member of Froehling, Weber, Evans & Schell, LLP ("the Firm"), prepared the Coop's Articles of Incorporation and signed them as an incorporator. Evans and his wife, Suzanne Ginger ("Ginger"), were shareholders of the Coop, and until early 2008, Evans served as the Coop's attorney and registered agent.

### Funding for Construction

To gather investors for the ethanol facility, Evans, at the direction of the Coop's board, created two Delaware limited liability companies, Central Illinois Energy, LLC ("Opco") and Central Illinois Holding Company, LLC ("Holdco"). Holdco consisted of Opco, HWS, Cargill, Fuel For Farmers, LLC, and Whitebox CIE Pledgors, Inc. ("Whitbox"). Mike Smith ("Smith") was the general manager for both Opco and the Coop and a member of the Coop's board.

In March 2005, the Coop contracted with Nostaw, a general contractor, to construct the grain handling facility for $5.4 million. To finance construction, the Coop borrowed $2 million from Whitebox, as evidenced by a note requiring payment in full on May 17, 2007.

The construction project began experiencing financial difficulties when the Coop was unable to pay invoices from Nostaw and the final installment of the Whitebox loan in May 2007. As a result, Nostaw threatened to file a lien and stop construction. The Coop needed to secure additional financing through other investors to continue construction.

### Green Lion Bio-Fuels, L.L.C.

Green Lion Bio-Fuels, L.L.C. ("Green Lion"), a company that Evans' wife formed in June 2006, was a potential source of financing. Ginger filed Articles of Formation for Green Lion with the Delaware Secretary of State, and on August 25, 2006, Evans filed an Application for Admission to Transact Business in Illinois on its behalf. (Bankruptcy Case No. 11-08023[1], Doc. 161, ¶45).

---

[1] Bankruptcy Case No. 11-08023 refers to the adversary proceeding *Cox v. Evans* in the U.S. Bankruptcy Court for the Central District of Illinois.

In early 2007, Ginger attended Coop board meetings and advised the board members that Green Lion wanted to develop ethanol projects in the area and was interested in financing construction of the ethanol facility. The board members were told that "Green Lion was a small group of investors with money in a bank in Minneapolis…" and that the company was interested in providing $140 million to fund the ethanol plant and grain handling facility. (Doc. 6-1, pp. 6-7).

*Waiver of Conflict of Interest*

In April 2007, Evans and his law partner, Nancy Schell ("Schell"), met with the Coop's board and advised the members that Opco and Green Lion were engaged in confidential business discussions related to Green Lion providing financing for Opco. Evans also advised the board that the Firm provided legal representation to the Coop, Opco, Holdco, Fuel From Farmers, LLC (a minority member of Holdco also managed by Ginger), and Green Lion.

Evans informed the board that members of the Firm's staff and/or their family members had equity interests in the Coop, Fuel From Farmers, LLC, and Green Lion, but he did not disclose the exact percentages of their interests. (Doc. 6-1, p. 8, ¶ 31; Doc. 17, p. 2, ¶ 31). At the time, the membership interests in Green Lion were held by Ginger (Evans' wife) (95.93419%), Amber Smudge Corp. (1.18652%), Fuel From Farmers, LLC (1.09951%), and Ken Pflederer (1.77978%).

Evans presented the board with a Waiver of Conflict of Interest, and the board members voted to authorize its chairman to execute the Waiver. Although Ginger held 95.93419% of the membership interests in Green Lion, the Waiver stated Ginger held a "minority" interest. ("Suzanne Ginger is one of the founders of Green Lion Bio-Fuels, and holds a minority equity financial interest therein."). (Doc. 6-6, p. 4).

***Green Lion Purchases the Grain Handling Facility***

On May 10, 2007, seven days before the Whitebox loan payment was due, Green Lion offered to lend the Coop $5 million to complete construction. Green Lion's chief operating/financial officer, Richard Kemple, informed Smith that Green Lion would have to purchase the grain handling facility to obtain a conventional construction loan.

The Coop and Green Lion agreed that the Coop would continue to manage the construction and Green Lion would provide the financing and take ownership of the grain handling facility pursuant to a Purchase Agreement. (Docs. 8-18, 8-19). Under a Buy Back Agreement, the Coop would have the right to repurchase the grain handling facility upon the occurrence of certain events. (Docs. 8-20, 8-21). Evans drafted the agreements and sent them to Schell, Kemple, and Smith to review.

At the end of May 2007, Evans met with Kenneth Eathington, an attorney at Husch Blackwell, to discuss Eathington's participation in the transaction on behalf of the Coop. Eathington was asked to review and comment on the Purchase and Buy Back Agreements Evans drafted.

On June 4, 2007, Evans and Schell met with the Coop board, and the board adopted a resolution authorizing the Coop to sell the grain handling facility to Green Lion for $7.75 million pursuant to the terms of the Purchase Agreement. Eathington did not attend the meeting.

On June 5, 2007, a day after the board authorized the sale of the facility, Eathington provided Schell with comments on the draft Purchase and Buy Back Agreements. Between June 5 and June 12, 2007, Schell circulated various revisions to the Agreements. (Bankruptcy Case No. 11-08023, Doc. 161, ¶¶105-106, 112, 116 and 122).

On June 12, 2007, the Coop sold almost all of its assets, including the unfinished grain handling facility to Green Lion for $7.75 million, subject to a repurchase obligation. Green Lion agreed to assume the Coop's liability to Nostaw ($976,295.67 and $258,777.83) and another contractor ($251,722.29) to offset the purchase price. Under the Purchase Agreement, the Coop remained responsible for the construction and completion of the grain handling facility, while Green Lion, through its lender, Ridgestone Bank, was responsible for construction pay requests.

On December 13, 2007, the Coop ceased work on the ethanol plant and grain handling facility and filed for Chapter 11 bankruptcy. On May 1, 2009, an involuntary Chapter 11 petition was filed against the Coop. On July 16, 2009, the bankruptcy case was converted to a liquidation proceeding under Chapter 7 of the United States Bankruptcy Code, and Richard Barber was appointed Trustee. On February 2, 2012, Plaintiff, A. Clay Cox ("Cox"), was appointed successor Trustee for the Coop.

### PROCEDURAL HISTORY & SUMMARY JUDGMENT ORDER

On April 4, 2011, Cox brought an adversary proceeding against Evans, Schell, and the Firm ("Defendants"). In Counts I, II, and III of Plaintiff's First Amended Complaint (Doc. 8-2), Cox alleges Defendants committed legal malpractice by failing to (i) obtain the full purchase price of the grain handling facility; (ii) advise the Coop not to pay certain closing costs for Green Lion; and (iii) advise the Coop not to accept membership shares in Green Lion as part of the consideration for the transaction. In Count IV, Cox alleges Evans engaged in self-dealing and breached his fiduciary duty to the Coop as a result of the Coop's conveyance of its grain handling facility to Green Lion. (Doc. 8-2, pp. 33-40). Count IV is pleaded in the alternative to Counts I, II, and III. (Doc. 8-2, p. 33).

Originally, the case was assigned to United States Bankruptcy Court Judge Thomas J. Perkins, who continues to administer the bankruptcy case. On March 13, 2018, Plaintiff filed a Motion to Withdraw Reference. (Doc. 1). On March 28, 2018, the District Court granted Plaintiff's Motion and the referral to the Bankruptcy Court was withdrawn pursuant to 28 U.S.C. § 157(d).

On June 8, 2018, Plaintiff filed a Motion for Partial Summary Judgment seeking summary judgment only on Count IV. (Doc. 6). On June 12, 2018, Defendants filed a Motion for Summary Judgment seeking judgment in their favor on all counts of Plaintiff's First Amended Complaint. (Doc. 10).

The issues presented in the motions for summary judgment were: (1) whether Defendants committed legal malpractice, and (2) whether Evans breached his fiduciary duty to the Coop. Doc. 30, at 7. In an action for legal malpractice under Illinois law, the plaintiff must first establish an attorney-client relationship existed between the parties. *Cleveland v. Rotman*, 297 F.3d 569, 572 (7th Cir. 2002). Plaintiff must also show (1) the defendant attorney owed the plaintiff a duty of care arising from the attorney-client relationship; (2) the defendant breached that duty; and (3) as a proximate result, the plaintiff suffered damages. *Tri-G, Inc. v. Burke, Bosselman & Weaver*, 222 Ill.2d 218, 225-26 (2006).

***Attorney-Client Relationship***

In its ruling on the motions for summary judgment, the Court found the undisputed material facts showed an attorney-client relationship existed between Evans and the Coop.

> [Evans] assisted and advised the Coop in connection with the purchase of the grain handling facility; he drafted the Purchase and Buy Back Agreements; and he was present at the board meeting on June 4, 2007. Moreover, both parties agree he was the Coop's attorney when the closing occurred in June 2007. As the Coop's attorney, Evans owed his client a fiduciary duty "to exercise the utmost good faith and fairness" when dealing with the Coop. See *Coughlin v. SeRine*, 154 Ill. App. 3d 510,

6

515 (1st Dist. 1987) (citing *Drake v. Becker*, 14 Ill. App. 3d 690, 694 (1st Dist. 1973)).

Additionally, after considering the evidence and drawing all justifiable inferences in favor of the non-movant, the Court finds that Schell also had an attorney-client relationship with the Coop. The undisputed material facts show that Schell played in integral role in drafting the Purchase and Buy Back Agreements and was present at the June 4, 2007, board meeting when the board voted to approve the Purchase Agreement and move forward with the transaction. As members of Froehling, Weber, Evans & Schell, LLP, the Court also finds an attorney-client relationship existed between the Coop and the Firm.

Doc. 30, at 9.

### Breach of Fiduciary Duty

Next, the Court addressed whether Defendants breached their fiduciary duties to the Coop. Doc. 30, at 10–14. To prevail on a breach of fiduciary duty claim under Illinois law, a plaintiff must prove that: (1) fiduciary duty existed; (2) the defendant breached its fiduciary duty; and (3) the breach proximately caused the plaintiff's injury. *Neade v. Portes*, 193 Ill.2d 433, 444 (2000). A fiduciary relationship exists between a client and his or her attorney as a matter of law. *Pippen v. Pedersen & Houpt*, 2013 IL App (1st) 111371, ¶ 22 (citing *Owens v. McDermott, Will & Emery*, 316 Ill. App. 3d 340, 351 (1st Dist. 2000)). "The fiduciary duty owed by an attorney to a client encompasses the obligations of fidelity, honesty, and good faith." *Pippen*, 2013 IL App (1st) 111371, ¶22 (quoting *Metrick v. Chatz*, 266 Ill. App. 3d 649, 656 (1st Dist. 1994)).

Rule 1.8 of the Illinois Rules of Professional Conduct provides, in relevant part:

(a) A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless:

 (1) the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing in a manner that can be reasonably understood by the client;

> (2) the client is informed in writing that the client may seek the advice of independent legal counsel on the transaction, and is given a reasonable opportunity to do so; and
>
> (3) The client gives informed consent, in a writing signed by the client, to the essential terms of the transaction and the lawyer's role in the transaction, including whether the lawyer is representing the client in the transaction.

ILLINOIS RULES OF PROF'L CONDUCT OF 2010 R. 1.8(a)(1)-(3) (2010).

All transactions between an attorney and a client "are subject to the closest scrutiny." *Johnson v. Gudmundsson*, 35 F.3d 1104, 1115 (7th Cir. 1994) (quoting *In re Marriage of Pagano*, 154 Ill.2d 174, 179 (1992)). When an attorney engages in a transaction with a client and benefits as a result, "the burden rests on the attorney to show that it is fair, equitable and just, and that it did not proceed from undue influence." *In re Imming*, 131 Ill.2d 239, 256 (1989). *See also Tower Investors, LLC v. 111 East Chestnut Consultants, Inc.*, 371 Ill. App. 3d 1019, 1035 (1st Dist. 2007).

To prove the benefit the attorney received did not result from undue influence, the attorney must prove "(1) that he made a full and frank disclosure of all the relevant information that he had; (2) that the consideration was adequate; and (3) that the principal had independent advice before completing the transaction." *In re Imming*, 131 Ill.2d 239, 256 (1989).

### *(1) Full and Frank Disclosure*

In ruling on the motions for summary judgment, the Court noted the parties agreed Evans informed the Coop that members of his Firm's staff and/or their family members had equity interests in the Coop, Fuel From Farmers, LLC, and Green Lion, but the parties disputed whether the extent of those equity interests were disclosed and if Evans provided adequate information to the Coop about Green Lion's financial condition. Further, although the Coop's board agreed to sign the Waiver of Conflict of Interest, the document indicated Ginger held a "minority" interest

in Green Lion. Yet, when the Waiver was signed, she held 95.93419% of the membership

interests. Based on these disputed facts, the Court found a genuine dispute of material fact

existed regarding whether Defendants made a full and frank disclosure of all relevant

information to the Coop. Doc. 30, at 12.

### *(2) Adequate Consideration*

The Court also found a material factual dispute existed with respect to consideration.

Doc. 30, at 12–13. Noting the parties' dispute over the purchase price and value of the grain

handling facility, the Court found "a genuine dispute of material fact as to not only what the

consideration was, but also whether it was adequate." *Id*.

### *(3) Independent Advice*

Next, the Court addressed the parties' arguments regarding independent advice. In

reaching its conclusion that a factual dispute existed, the Court reasoned:

> The parties also dispute whether the Coop had independent legal advice. Evans argues the Coop engaged Eathington, an independent attorney, to represent the Coop. Cox argues Eathington was additional (not separate) counsel because Evans and the Firm ultimately maintained control of the transaction. (Doc. 6-14, p. 26). Additionally, Cox argues Eathington understood Evans and Schell would perform all legal services necessary to negotiate and document the transaction. (Doc. 6-1, p. 12, ¶ 48). Cox asserts the purpose of Eathington's engagement was to review and comment on those documents and prepare the deed and real estate transfer declaration. (Doc. 24, p. 8).

> Evans and Schell were present at a Coop board meeting where the board voted to authorize the Coop to enter into a refinancing arrangement with Green Lion. However, Eathington had not yet reviewed the Purchase Agreement, nor was he present at the board meeting. (Doc. 6-14, p. 27). In fact, the record demonstrates Eathington did not comment on the Purchase Agreement until June 5, 2007, the day *after* the board adopted a resolution authorizing the sale of the grain handling facility to Green Lion. (Doc. 24, p. 8). In addition, Eathington was not present at the closing. (Doc. 6-9, p. 5).

> Evans argues that Eathington actively participated in representing the Coop, commented on the Purchase and Buy Back Agreements, and prepared the deed and tax form. (Doc. 17, p. 18). Evans claims that from April 23, 2007, through closing,

Smith did not rely on Evans or his Firm to provide legal advice with respect to the transaction. (Doc. 18, p. 3, ¶ 49).

However, the evidence demonstrates that Evans prepared and circulated the initial drafts of the Purchase and Buy Back Agreements, authored and circulated legal opinions on behalf of the Coop and Green Lion, and negotiated the Nostaw Payment Agreement and Green Lion Loan. (Doc. 24, pp. 50-51). Furthermore, Schell edited the Agreements, drafted an escrow agreement, prepared and executed a Green Lion membership resolution, and participated in the closing. *Id.*

Mike Smith testified that if he had questions concerning the validity or enforceability of the transactional documents, he would have asked someone at Evans' firm to clarify. (Doc. 6-14, p. 28; Doc. 11-1, at 173:19 – 174:5). After the transaction was complete, Eathington sent his $4,285.88 invoice directly to Evans, not the Coop, for payment. (Doc. 6-14, p. 28). While it is undisputed that Eathington represented the Coop in some capacity, the extent of his representation and whether it was independent, are factual issues only the finder of fact can resolve. As such, the Court finds that a genuine issue of material fact exists as to whether Defendants – acting as the Coop's counsel – breached the fiduciary duty they owed to their client.

Doc. 30, at 13–14.

### *Proximate Cause*

Finally, the Court addressed the issue of proximate cause. Doc. 30, at 14–15. In order to survive a motion for summary judgment, Cox must show the Coop suffered actual damages as a result of Defendants' alleged legal malpractice. Actual damages are essential to a viable cause of action for legal malpractice. *Tri-G, Inc. v. Burke, Bosselman & Weaver*, 222 Ill.2d 218, 226 (2006). Under Illinois law, "[t]he proper measure of damages in a legal malpractice case puts a plaintiff in a position he would have been had the attorney not been negligent." *Meriturn Partners, LLC v. Banner and Witcoff, Ltd.*, 2015 IL App (1st) 131883, ¶ 18 (citing *Gaylor v. Campion, Curran, Rausch, Gummerson and Dunlop, P.C.*, 2012 IL App (2d) 110718, ¶ 61). "The existence and amount of damages in a legal malpractice case is a question for the jury and great weight must be given to the jury's determination." *Meriturn Partners, LLC*, 2015 IL App (1st) 131883, ¶ 18 (citing *Union Planters Bank, N.A. v. Thompson Coburn LLP*, 402 Ill. App. 3d 317, 356 (2010)).

In ruling on this issue, the Court noted:

"The issue of proximate causation in a legal malpractice setting is generally considered a factual issue to be decided by the trier of fact." *Governmental Interinsurance Exchange v. Judge*, 221 Ill.2d 195, 210 (2006) (quoting *Renshaw v. Black*, 299 Ill. App. 3d 412, 417-18 (1998)). Such a determination is to be made by the trier of fact after consideration of all the evidence and attending circumstances. *Judge*, 221 Ill.2d at 210. The issue of proximate causation should never be decided as a matter of law where reasonable persons could reach different results. *Nettleton v. Stogsdill*, 387 Ill. App. 3d 743, 753 (2008). See also *Public Taxi Service, Inc. v. Barrett*, 44 Ill. App. 3d 452, 456 (1st Dist. 1976) (proximate cause should be determined as a matter of law only where (1) the facts are undisputed and (2) there can be no difference in the judgment of reasonable persons as to the inferences that may be drawn from the facts).

Doc. 30, at 14. In light of the above, the Court held that, even if the Court were to assume Evans breached his fiduciary duty, the Court would be unable to grant summary judgment on Counts I, II, III, and IV of Plaintiff's First Amended Complaint because genuine issues of material fact exist as to whether Defendants proximately caused the alleged damages. *Id.*

**PLAINTIFF'S MOTION IN LIMINE**

Defendants disclosed and designated Walker R. Filbert as their expert witness on September 30, 2019. Filbert is a lawyer with 26 years of experience practicing law and approximately 14 months as the chief executive officer of an ethanol company unrelated to this case. On November 20, 2019, Filbert testified at a deposition. Doc. 60-2. In sum, Filbert's report and testimony conclude that, given the state of the ethanol industry in 2007 and the need to complete the grain handling facility then owned by the Coop, Evans and Schell met the standard of practice for attorneys practicing law in central Illinois and that their conduct did not proximately cause any injury to the Coop. In Plaintiff's Motion, he argues (1) Filbert's experience as a lawyer in central Illinois and a CEO of an ethanol company do not qualify him to opine on issues involving Defendants' dual representation of the seller and purchaser in a complex real estate transaction; (2) Filbert's report is devoid of any proposed methodology or

analytic strategies widely used by specialists that show how his opinions were formulated; and
(3) aspects of Filbert's Report are outcome-determinative, invade the province of the jury, and
are partly based on unsupported assumptions. Doc. 57. In their Response, Defendants argue: (1)
Filbert meets the standard to testify as an expert under Federal Rule of Evidence 702; (2)
Filbert's Report and deposition testimony set forth the required analysis and how he arrived at
his opinions; and (3) Filbert may testify as to the ultimate issue in the case. Doc. 60. This Order
follows.

## LEGAL STANDARD

Rule 702 authorizes an expert witness—qualified by their knowledge, skill, experience,
training, or education—to present opinion testimony if the testimony will help the trier of fact
understand the evidence or determine a fact in issue, as long as the testimony is based on
sufficient data, using reliable methods, and the expert has applied the principles reliably to the
facts of the case. Fed. R. Evid. 702. Although Rule 702 was updated in 2000, *Daubert v. Merrell
Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), continues to be the "gold standard for
evaluating the reliability of expert testimony and is essentially codified in the current version of
Rule 702." *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 806 (7th Cir. 2013).

*Daubert* requires the Court to evaluate "(1) the proffered expert's *qualifications*; (2) the
*reliability* of the expert's methodology; and (3) the *relevance* of the expert's testimony."
*Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017) (emphasis in original);
*see also Hartman v. EBSCO Indus., Inc.*, 758 F.3d 810, 817 (7th Cir. 2014). The party seeking to
introduce the expert testimony must meet the *Daubert* standard by a preponderance of the
evidence. *Krik v. Exxon Mobil Corp.*, 870 F.3d 669, 673 (7th Cir. 2017). A court examining a
*Daubert* challenge is a gatekeeper, not an arbiter of truth: "the key to the gate is not the ultimate

correctness of the expert's conclusions. Instead it is the soundness and care with which the expert arrived at her opinion." *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013).

**DISCUSSION**

***Filbert's Report***

In his Report, Filbert first recites his legal experience and qualifications. Prior to becoming an attorney, Filbert worked as a certified public accountant working in the utilities industry. Doc. 60-1, at 1. Filbert became a licensed attorney in Illinois in 1992 and has privately practiced in diverse areas of law since then. Additionally, from 2006 to 2008, Filbert was employed as the Chief Executive Officer of Heartland Ethanol, where he worked with local investors to build and operate ethanol plants in Illinois. *Id*. at 2.

In preparation for his Report and deposition, Filbert reviewed the complaint, answer, motions for summary judgment, the Court's order on those motions, the various agreements between the parties, including the purchase and buy back agreements, settlement statements, assignments, Defendant's trust account ledger, the Coop's board minutes, reports and depositions of other witnesses, Plaintiff's expert report, and Rules 1.2(a), 1.4, 1.7, and 1.8 of the Illinois Rules of Professional Conduct. *Id*. at 2–4. Filbert's Report discloses the following:

> 1. Based upon my education, training and experience as a practicing attorney and as a former CEO of an Ethanol company, and after a review of the materials in this matter, I have formed the following opinions, to a reasonable degree of legal certainty.
>
> 2. A review of the Preamble to the Illinois Rules of Professional Conduct is instructive for two reasons. First, while the rules apply at all times, the main focus is clearly for in court litigation and representation where, as far as conflicts go, it is obvious that representing both sides is problematic. Second, recognition of the delicate balancing act undertaken by representation is detailed by this quote from the Preamble: "To reach correct ethical decisions, lawyers must be sensitive to the duties imposed by these rules and, wherever practical, should discuss particularly difficult issues with their peers."

13

3. This was not litigation; this was a business deal taking place within the context of a volatile period in the ethanol industry. The "big" issue was that everyone involved was trying their hardest to get an ethanol plant operational. Coop needed grain. Coop needed financing. Coop needed contractors. Coop needed to keep moving or the window of opportunity would close (which it did in Autumn of 2007). A big part of this effort was getting Whitebox out of the grain handling facility.

4. Whitebox was a group of sophisticated investors investing in ethanol projects, including this project. They were the big problem. Whitebox wanted its money back as it had soured on the project. Whitebox' decision to stop funding construction of the grain handling facility drove the 2007 transaction; and, both Green Lion and the Coop needed to make that happen so as to keep construction moving forward. Without the transaction, everything would halt. Removing Whitebox was the priority. Indeed, Whitebox got what it wanted-- money. Green Lion and Coop got what they wanted—a continuation of the project.

5. From the documents that I reviewed and based upon my experience, all the players knew all the players. The ethanol business involved a relatively small cast of players. The local agricultural community were known to all. Coop knew Mr. Evans, Ms. Schell and Froehling, Weber, Evans & Schell, LLP (Attorneys). Attorneys knew Coop. Coop knew Green Lion and that Mr. Evans' spouse was with Green Lion. Coop had an interest in trying to make the ethanol plant a reality and needed an operational grain handling facility to do so. Coop wanted to get out from underneath Whitebox. Accordingly, this transaction was consummated by the Coop board.

6. Any focus on the ownership structure and equity makeup of Green Lion is irrelevant to this analysis and misleading. This was a business decision by Coop on how best to buy out Whitebox and allow the overall project to move forward.

7. Attorneys met the standard of practice for an attorney practicing in Central Illinois. The acts or omissions alleged by the Trustee did not proximately cause the damages which the Trustee claims. Coop did not rely on Attorneys for legal advice in the sale and purchase of the grain handling facility. Coop knew that Attorneys were related to and had dealings with Green Lion prior to the transaction. Before undertaking preparation of the documents related to the transaction Mr. Evans advised Coop that Attorneys would not provide legal advice to Coop or to Green Lion with respect to the sale and purchase of the grain handling facility. The Coop instead engaged Mr. Eathington to advise it in the transaction.

8. Assuming arguendo that the attorneys and the Coop had an attorney client relationship, Attorneys met the standard of practice for attorneys practicing in Central Illinois. To the extent disclosure was necessary, Evans disclosed the pertinent conflicting interests: Attorneys had previously represented all of the involved parties, and that his wife was an owner of Green Lion. Moreover, the

14

Conflict Waiver disclosed his wife was the Manager of Green Lion. Coop as the "client" knew all the players involved in the transaction prior to the disclosure and conflict waiver and consented to proceed for the mutual benefit of buying out Whitebox and allowing the overall project to continue. Coop gave informed consent to Attorneys' involvement.

9. Mr. Smith and Mr. Kemple negotiated the terms of the transaction between themselves. Coop received in the transaction what it contracted to receive: Cash, assumption of certain debts by Green Lion, and 2,385,000 membership shares in Green Lion. All of this was spelled out in the Purchase Agreement which Mike Smith signed. Coop formed its own opinion of the value of the Green Lion membership shares. The terms were fair and equitable, fully, accurately and understandably disclosed and Coop gave informed consent to the essential terms of the transaction.

10. Coop and Green Lion were aligned for the purpose of buying out Whitebox and allowing the construction of the grain handling facility and ethanol plant to come to completion. Aside from being told by Attorneys of the potential conflict of interest, Coop had independent knowledge of the relationships between Mr. Evans, Ms. Ginger and Green Lion. Mr. Evans and Mr. Smith had known each other for a number of years prior to the transaction. Mr. Smith knew Mr. Evans was married to Ms. Ginger, as did many of Coop's directors. Similarly, Ms. Ginger's ownership in Green Lion was not a decision-making factor for the Coop directors. The important thing for the Coop directors was that Green Lion could borrow the money to pay off Whitebox.

11. Just as mentioned in the Preamble of the RPC, Defendants reached out to a peer, Mr. Eathington, to advise Coop in the transaction. He reviewed documents. He could have commented at any time. Indeed, he did comment, but he was ultimately ignored by the board of Coop. Coop was advised of its right to consult with independent counsel and did consult with independent counsel.

12. Coop consented to Attorneys' involvement in preparation of the documents for the transaction. The Coop agreed to waive any conflict of interest which may be present as a result of Attorneys' participation in the transaction.

13. Furthermore, the $7,750,000 amount stated in the Purchase Agreement and the 2,385,000 membership units in Green Lion were merely "plug" numbers. The most important numbers in the transaction were the buyout of Whitebox and the loan origination fees. Therefore, even if RPC 1.7(a)(1), 1.7(a)(2), 1.8(a)(1) and 1.8(a)(2) had been invoked, Defendants reasonably determined that there were no conflicting interests, but rather overriding mutual interests, and that they exercised professional judgment in consummating a deal that everyone wanted at the time.

14. Therefore, it is my opinion that Attorneys met the standard of practice for attorneys practicing in Central Illinois and that the acts and omissions asserted by the Trustee did not cause the claimed damages.

Doc. 60-1, at 4–6.

### *Plaintiff's Motion to Bar the Testimony of Defendant's Expert*

#### (1) the Proffered Expert's Qualifications

Plaintiff first argues Filbert's experience as a lawyer in central Illinois and a CEO of an ethanol company do not qualify him to opine on issues involving Defendants' dual representation of the seller and purchaser in a complex real estate transaction. Specifically, Plaintiff argues Filbert has no experience with professional responsibility and legal malpractice, issues which are central to this case. Plaintiff identifies the following legal standard in support of his argument:

> [I]n a legal malpractice suit, an expert on the standard of professional care does not necessarily need to be qualified by experience in the particular specialty; a lawyer may instead be qualified by studying the law, i.e., by "knowledge" rather than "experience" under Rule 702, but general legal training and even standing in the local legal community do not always qualify a lawyer to opine on the standard of professional care. *Compare CDX Liquidating Trustee ex rel. CDX Liquidating Trust v. Venrock Assocs.*, 411 B.R. 571, 585 (Bankr. N.D. Ill. 2009) (holding law professor specializing in corporate governance law was qualified to opine on fiduciary obligations under Delaware law even though he had not practiced in Delaware), *with Landeen v. PhoneBILLit, Inc.*, 519 F. Supp. 2d 844, 848 (S.D. Ind. 2007) ("Although the Court has no doubt that [the witness] has considerable experience as a lawyer in the Indianapolis community, there is no specialized training, experience, or education in [the witness]'s background that would qualify him as an expert on matters of legal malpractice."); *Noske v. Friedberg*, 713 N.W.2d 866, 872 (Minn. Ct. App. 2006) (affirming exclusion of law professor's testimony because "his lack of practical or academic experience in the criminal-law area made it unlikely that his testimony on the duty of a criminal-defense attorney would have been admissible as expert opinion").

*Rivera v. Guevara*, No. 12-CV-04428, 2018 WL 3093339, at *6 (N.D. Ill. June 22, 2018). Plaintiff goes on to cite opinions where attorneys and judges were found not to satisfy Rule 702's expert qualification requirements. Doc. 57, at 9–11. Although it is true that Filbert lacks experience in prosecuting or defending legal malpractice or attorney disciplinary actions, unlike

the cases cited by Plaintiff, Defendant's proposed expert has significant practical experience representing clients, particularly in commercial transactions, and also has experience in dealing with legal and business issues specific to the ethanol production industry through his time as a CEO of an ethanol company. As a practicing attorney, Filbert would have been required to understand the rules of professional conduct governing his practice of law and to follow those rules. Those obligations encompassed the dispute at issue here—ascertaining the standard of care for an attorney. The Court finds Defendant has satisfied its burden of establishing Filbert possesses the requisite knowledge and experience to opine on whether Evans and Schell met the standard of care when they represented both the Coop and Green Lion in the real estate transaction. *See Hall v. Flannery*, 840 F.3d 922, 929 (7th Cir. 2016) ("The fact that an expert may not be a specialist in the field that concerns her opinion typically goes to the weight to be placed on that opinion, not its admissibility.").

### (2) the Reliability of the Expert's Methodology

Next, the Court must consider whether Filbert's proposed testimony is based on reliable knowledge and methodology. *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017). Plaintiff argues Filbert's report is devoid of any proposed methodology or analytic strategies widely used by specialists to show how his opinions were formulated. *See* Doc. 57, at 12 (arguing "Filbert purports to solve the equation but does not show his work"). Rather, Plaintiff portrays Filbert's opinions as resting entirely on his alleged expertise as a lawyer, drawing conclusions without any analysis. *Id.* at 12.

"When an expert proffers testimony based on his experience, '[i]t is critical under Rule 702 that there be a link between the facts or data the expert has worked with and the conclusion the expert's testimony is intended to support.' " *Webster Bank, N.A. v. Pierce & Assocs., P.C.*, No.

17

16-CV-2522, 2020 WL 616467, at *2 (N.D. Ill. Feb. 10, 2020) (quoting *United States v. Mamah*,

332 F.3d 475, 478 (7th Cir. 2003) ("[E]xperts' opinions are worthless without data and reasons.")

(citing *Kenosha v. Heublein*, 895 F.2d 418, 420 (7th Cir. 1990)).

In its Response, Defendants rely on the district court decision in *Webster Bank*.

Specifically, Defendants argue Filbert detailed how his experience as an attorney practicing in

central Illinois, and his experience as CEO of an ethanol plant linked to his opinions. Doc. 60, at

8. Plaintiffs state Filbert reviewed all the relevant documents underlying the transaction and the

depositions of the relevant witnesses, and his Report includes a summary of the facts gleaned

from these materials. *Id.*

In *Webster Bank*, the Court allowed expert testimony by an attorney on the standard of

care after finding:

> Here, Webster has demonstrated that Murphy is qualified by knowledge and
> experience to address the standard of care for Illinois civil litigators. The Court
> agrees with Plaintiff that the crux of this case is not about the nuances and
> intricacies of the single refiling rule or debt collection practices. Rather, the issue
> before the jury involves the standard of care for a reasonable attorney practicing in
> Illinois under similar circumstances. Murphy is a seasoned Illinois civil litigator
> who currently practices in state court. His principal basis for his opinions is his own
> experience and knowledge, and that basis is sufficiently reliable to survive a
> challenge under *Daubert* and the Federal Rules of Evidence. Pierce may attempt to
> demonstrate or argue that the jury should not credit Murphy's opinions due to his
> limited familiarity with Cook County or debt collection practices, but that is a
> question of the weight a jury should give to the evidence rather than its
> admissibility. Murphy is qualified to opine in this matter.

*Webster Bank*, No. 16-CV-2522, 2020 WL 616467, at *3.

Here, Filbert's Report consists largely of his recitation of facts he deemed relevant to the

transaction. Filbert uses the facts to place the circumstances of the particular transaction in

context. Based on his knowledge and experience, Filbert offers opinions as to the parties'

respective business interests and goals in securing financing for the grain handling facility and

ensuring its timely completion. Doc. 60-1, at 4–6. His opinions were informed by his legal experience and his knowledge of practicing law in central Illinois. Based on these opinions, Filbert concludes Defendants' conflict disclosure was adequate. Further, Filbert concludes the transaction was fair and equitable and in the best interest of both the Coop and Green Lion. Based on these findings, Filbert concludes Defendants met the standard of practice for attorneys practicing in central Illinois. *Id*. The Court finds Filbert's report and proposed testimony sufficiently link the facts he relies upon with his conclusions so as to be reliable. *Webster Bank*, No. 16-CV-2522, 2020 WL 616467, at *2.

### (3) the Relevance of the Expert's Testimony

Next, the Court must consider whether Filbert's proposed testimony is relevant. *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017). Here, Plaintiff makes no specific argument that Filbert's proposed testimony lacks relevance to the issues at hand. Again, Filbert offers opinions as to the parties' respective business interests and goals in securing financing for the grain handling facility and ensuring its timely completion. Doc. 60-1, at 4–6. He also explains the peculiarities of practice in central Illinois, where members of the legal community are likely to know each other, and he provides context to the transaction by explaining the state of the ethanol industry in the late 2000s and the economic considerations ethanol businesses were dealing with at the time. "The touchstone of admissibility under Rule 702 is helpfulness to the jury. The crucial question is, [o]n *this subject* can a jury from *this person* receive appreciable help." *United States v. Benson*, 941 F.2d 598, 604 (7th Cir. 1991) (emphasis original) (internal quotations omitted). Here, Filbert's proposed testimony will relevant and helpful to the jury because the lay juror is unlikely to have a strong understanding of the business considerations surrounding the purchase or sale of commercial property. Moreover,

Filbert's experience in the ethanol industry and his testimony as to what the goals and interests of the parties to the transaction were at the time will be helpful to the jury, as the average juror is unlikely to understand how and why such transactions occur in the ethanol industry and the process by which they are consummated without expert testimony. Thus, the Court finds Filbert's testimony to be relevant and helpful to the jury, and he may testify as to the standard of care, what reasonably careful lawyers would have done, and whether Defendants made mistakes in this regard.

***Whether aspects of Filbert's Report are outcome-determinative, invade the province of the jury, or are partly based on unsupported assumptions***

Next, Plaintiff argues portions of Filbert's Report invades the province of the jury and are based upon unsupported assumptions. Doc. 57, at 13. First, Plaintiff argues Filbert's Report invades the province of the jury when he concludes "[t]he acts or omissions alleged by the Trustee did not proximately cause the damages which the Trustee claims." *Id*. At his deposition, Filbert elaborated on this conclusion:

> Q. Well when we were leaving, you said that proximate cause, in your opinion, was related to the standard of care. That's why you included the statement in your report.
> A. Yes.
> Q. How is it related?
> A. Well, obviously, you know, you have your standard of care, and then if something goes wrong, you want to know if that standard of care had any relationship to what went wrong, and so I added it to my report for the main reason that, unfortunately, if you were in the ethanol space during this particular period of time, things went south very quickly and there's very little anybody could have done to have completed a project because of the overall evaporation of the ability to get further financing or equity.

Doc. 60-2, at 62–63 (ECF page number).

"An opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704. However, "[a]s a general rule, an expert may not offer legal opinions." *Valencia v.*

*City of Springfield, Illinois*, No. 16-3331, 2020 WL 1847679, at *2 (C.D. Ill. Apr. 13, 2020)

(citing *Jimenez v. City of Chicago*, 732 F.3d 710, 721 (7th Cir. 2013)). "Expert testimony as to

legal conclusions that will determine the outcome of the case is inadmissible." *Good Shepherd*

*Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003) (citing *United States*

*v. Sinclair*, 74 F.3d 753, 757 n. 1 (7th Cir. 1996)). "In considering whether an expert witness's

testimony will improperly invade the judge's role as the sole source of the relevant law at a trial,

courts and parties must recognize the difference between "stating a legal conclusion" (which is

not permitted) and "providing concrete information against which to measure abstract legal

concepts" (which is permitted)." *United States v. Neushwander*, No. 15 CR 542-1, 2017 WL

4572212, at *3 (N.D. Ill. Oct. 14, 2017) (citing *United States v. Blount*, 502 F.3d 674, 680 (7th

Cir. 2007).

Here, Filbert's conclusion that "[t]he acts or omissions alleged by the Trustee did not

proximately cause the damages which the Trustee claims" is an impermissible legal conclusion

which is reserved for the jury to decide. As the Court held in its summary judgment order, "[t]he

issue of proximate causation in a legal malpractice setting is generally considered a factual issue

to be decided by the trier of fact." *Governmental Interinsurance Exchange v. Judge*, 221 Ill.2d

195, 210 (2006) (quoting *Renshaw v. Black*, 299 Ill. App. 3d 412, 417–18 (1998)). Thus, Filbert

is not permitted to testify to the jury that Defendants' conduct was not the proximate cause of the

damages claimed by the Trustee.

However, "such determinations may require the drawing of a fine line." *Valencia v. City*

*of Springfield, Illinois*, No. 16-3331, 2020 WL 1847679, at *2 (C.D. Ill. Apr. 13, 2020). For

example, while an expert may not opine that a defendant committed fraud, *see  Neushwander*,

2017 WL 4572212, at *4, the Seventh Circuit has held "expert testimony is allowed to the effect

that financial transactions did not comply with regulations and appeared to be fraudulent."
*United States v. Davis*, 471 F.3d 783, 789 (7th Cir. 2006); *United States v. Owens*, 301 F.3d 521, 526–27 (7th Cir. 2002). Thus, while Filbert may not offer an opinion in front of the jury as to proximate cause, he may opine, consistent with his deposition testimony, that market forces and the state of the ethanol industry following the transaction affected the viability of the grain handling facility and the prospects of obtaining financing. *See* Doc. 60-2, at 62–63.

Plaintiff also argues Filbert's opinions are predicated on his factual narrative and unsupported assumptions, though Plaintiff fails to specify exactly which assumptions are unsupported. Doc. 57, at 13. Without providing the Court specific arguments as to which assumptions are unsupported, the Court is unable to meaningfully address Plaintiff's argument. On this record, the Court believes Plaintiff's arguments are better suited for cross examination at trial.

Lastly, in light of the Court's findings in its summary judgment order, Filbert will not be able to testify that there was not an attorney-client relationship between Defendants and the Coop or that there was not an attorney-client relationship between Defendants and Green Lion. *See* Doc. 30, at 6; Doc. 60-2, at 61.

## CONCLUSION

For the reasons set forth above, Plaintiff's Motion (Doc. 56) to Bar the Testimony of Defendants' Expert Walker R. Filbert is GRANTED in part and DENIED in part.


Signed on this 1st day of May, 2020.

s/ James E. Shadid
James E. Shadid
United States District Judge